May it please the Court, my name is Joseph Alioto, I represent the appellant. I respectfully ask the Court for permission to reserve two to three minutes for rebuttal. You may. Thank you. This case is about a situation in which there is an effort to protect and defend a bid-rigging combination between companies that are responsible for the supply of heavy-duty air conditioning equipment, heating and ventilation equipment for large commercial buildings for the government and also for private parties. In order to protect and defend this bid-rigging combination, the defendants engaged in massive bribery and in tying and coercive tying arrangements requiring and excluding any potential competitors. Go ahead. Let me focus you in, counsel, on the tying claims on which the district court granted summary judgment. What is the tying product market? Because there were a couple of variations in the court below. What have you settled that on? Because until that's clearly defined, it's hard to assess whether there's sufficient market power in this case. Two points, if it please Your Honor. One, sufficient market power is not necessary under the Cartwright Act. That was misread by the court below, which we pointed out. What is needed there is the amount of commerce that is excluded. Secondly, the tying product is the forced product. It's a product in which it is claimed by the persons giving the specs who were given the bribes to say that a particular product was required, and they would say that there's no known substitute for it. And whether they called it, they called it different names, flat spec or no known product. The idea was to the commercial person who gave the spec, okay, if you want that, you have to take everything else that I have. And there was only one other company in this business that had the ability to supply all the other products, and that was this plaintiff. And so in order to exclude him and to protect and defend the bid rigging that was in place, they used the tying products and the bribery, Your Honor. So the tying product market would be the flat spec products? Yes. And is that project dependent? It is. Or is that for all projects that have to do with heating and cooling? They insert that, the different people who do the specs insert that, and they insert it because they're bribed to do it. Even though there is a comparable product that is not necessary, but they make it necessary in the specifications. And the reason they do is because of these bribes. And in addition to that, and in order to enforce it further, is that they require these people that if you do not buy all my other products, I'm not going to give you the one that you actually need. Okay, so what you're saying is that whatever the project is, the defendant in this case would conspire with a subcontractor or a designer, which is either one, or it would be- Yes, Your Honor. Design specifier? Correct, Your Honor. They bribe them, and then whatever the product was that they got through this bribe agreement, that would become where the defendant had market power over, at least with respect to that product. Is that correct? Yes, Your Honor, although market power was not necessary under the Cartwright Act. All right, so you're giving up on the Federal claim? Of course not. Well, all right, so let's talk about, so your theory, just to be clear, is that they established for both Sherman Act and for Cartwright Act, market power in whatever was specified that nobody else could provide because of the bribed  agreement. Yes, there was a competing product that could do the same thing. Nonetheless, they were able to get the different people with regard to the specifications or the subcontractor to be able to say, well, we're not going to deal with the plaintiff, and it had to be full-line forcing. One of the defendants, Spencer, was a subcontractor. You can see in our briefs that he advised that he would only buy at the lowest price, and we gave him the major jobs, projects like the Moscone Center or the San Bruno Jail, big buildings, big commercial products. And with regard to those, we were $1 million less than what the defendant offered. And Spencer He said, didn't he testify that your client's testimony was unresponsive on the products? He testified he always took the lowest product, lowest price. He gets on the stand, and he changes it. And then I got him on the cross-examination, as we put in our brief, to admit that he changed it for the purpose of the trial, and the court, for some reason, determined that he would get directed verdict on basically deciding credibility of the witness. This man What was the relevance of his testimony that changed? I mean, didn't the court say, well, so what? So he decided to pick the bid that he thought was most responsive. Yes, yours was $1 million lower, but it wasn't responsive on the total requirements of the bid. So I picked the defendant because they had a responsive bid. That is the changed testimony, Your Honor. That is not what the witness originally testified in his deposition. He said under no circuit, he would always take the lowest price, period. When it was shown that, in fact, he had accepted a price that was more than $1 million less than the other defendant with whom he had already made an agreement that he already was going to buy the defendant's product, quite regardless of any bid from the plaintiff or anyone else, he comes into the courtroom and he says, well, I really don't care, then he changes his testimony to say responsive bid, and then I asked him whether or not he changed it for the purpose of the trial, and he said, absolutely. And we have that testimony right in the record. Mr. Aliota, would you give an example of a bribe paid to get one of the contracts? There were a number of different Just give one, please. The defendant would supply, for example, furniture for one of these folks, and the defendant would supply the furniture for one of these folks. Supplying the furniture for one of these people for their new home in Mexico. Bringing people to Central America for What was the case? Give me the case and who was given the furniture and so forth. The defendant would supply, for example, furniture for some one of these folks. Who were the folks? Either the person who does the specification or the subcontractors, the people who are working to make the decision. You don't know who was getting the bribe? Yes, of course we did. We had them on the stand, Your Honor. Who was it? We had people who were subcontractors, people who were mechanical engineers who were making the decision, subcontractors, contractors. They did the whole We wanted specifics. Who got a bribe for furniture in their home in Mexico? Certain mechanical But what was the name? Cal West, Your Honor. I'm sorry that I forgot that particular name because they were these were massive. They had a number of people in which they would send them down to Central America in order to change the specifications. They would do landscaping for them of hundreds of thousands, $100,000 or so. This kind of thing infected the entire industry, and there was no way that any independent competitor could compete against that because these bribes affected supply and demand, and they prevented any competitor from being able to compete on the merits. And the whole purpose of it was to protect and defend their bid rigging agreements that they had. We had bid a million dollars less on a number of different projects, and nonetheless we weren't able to get them, and it was because the market was infected. You can see in our briefs all the testimony we have from the various people who are instrumental in determining who would get the bid as to whether or not they were part and parcel of receiving these gifts and these so-called gratuities which were just out and out blatant. In addition, the tying was used for those who were recalcitrant. We did get one job, Parnassus, a very large UCSF, and when we got that, the defendants and the others immediately came in and started to threaten those people for taking us instead of them. That was one of those rare examples. Okay. Let's address the price-fixing bid rigging claim. May I get a glass of water? Pardon? May I get a glass of water? May I get a glass of water? Oh, of course. Thank you. Thank you, Your Honor. You're welcome. Just a second. Bid rigging, Your Honor? Yes. What's the nature of that claim? The nature of that claim, Your Honor, is that there was a combination by the defendant who was the main distributor, who had exclusive agreements with practically all of the different manufacturers to deal with subcontractors and contractors so that they would get the bid even before the bid was decided. Now, what were your damages from that? That is not, as we advised the court, we didn't have, because we're not the project, but that was the motive to preserve that and to keep it intact, that they used the other means, like the bribes and the tie-in, to prevent us from coming in. So we're not saying, the court misunderstood that completely, we're not saying that we were a project. We're the competitor. And so the project, they were fixing the bids on the project, and that's what they wanted to protect and defend it against competitors like us. So when we tried to come in, we couldn't compete against the tie-in, and we couldn't compete against the bribes. And there was no way for us to be able to compete on the merits. So we tried, when we did try and compete on the merits, and we had exactly the same kinds of products. And when we were substantially below on these major projects, we couldn't get the bid, no matter. So there was no question that on the merits, merits had nothing to do with it. The free enterprise on these projects was interfered and infested with these tie-ins, which were coercive and strong, and the bribes that obviously influenced the people who were making the speculations. Okay. Go ahead. Okay. Another instance. The trial itself was so caught up, and by letting Spencer out on the basis, even though he admitted in front of the jury, that he had changed his testimony for the purpose of the trial, that the trial was so caught up, that we were finally faced, there was no Cartwright. All Cartwright Act was thrown out. The Court misread Morrison, which was very clear about in Cartwright, you don't need economic power, but we could show it anyway. But you don't need it. What you show in Cartwright is whether or not a substantial amount of commerce was diverted by reason of the tie-in. And in this case, we're talking about hundreds of thousands and millions of dollars. And, of course, in the Federal system and under Fortner, $75,000 was originally more than enough, or $200,000. We satisfied all of those. We even had the secret rebate under Cartwright. The Court threw that out. And so then, when we came to interstate commerce for the Federal system, this was admitted in their answer to the complaint. Counsel, that is in your brief. So why don't you, I'll give you some time on rebuttal. Let's hear from the defendants. Very good, Your Honor. May it please Your Honor. Good morning, Your Honors. Robert Bunzel on behalf of Defendant Norman Wright. There are two co-defendants in this case, or co-appellees. And my colleague, Mr. Bailey, will take the last two minutes. So I'll sit down when the yellow light comes on. All right. You'll have a little leeway on time. I gave counsel for the plaintiffs a little time. Thank you. Before I address the points that have been raised today, and I don't want to re-argue what's in our brief, I did want to just make a general observation about this case. We came in to try this case after much of the discovery had occurred. The discovery occurred over a six-year period. It's an enormous amount of effort to uncover this case and to provide a management structure for the case by Judge Ware. The district court thereafter weeded out in pretrial motions those claims that would not stand to be tried because for legal reasons, either lack of standing or failure of proof on material facts before trial. Then there was a seven-and-a-half-week trial, and the court claims were tried. The bribery claim, so-called bribery under Robinson-Patman, was tried for seven-and-a-half weeks. The evidence came in. The court very carefully instructed the jury on bribery, anti-competitive conduct, and the like. And the instructions, which are at 5 S.E.R. 1108 to 1160, are very, very careful. This is a paradigmatic case, really, of the justice system working painfully for my claim because it took so long, but correctly. All of the persons involved, the judge, the parties, and ultimately the persons in the jury panel doing the right thing. Mr. Aliotto mentioned bid rigging. He said, you know, we are not a project. I'm not sure what that means. Judge Fisher, you asked him, what are the damages here, which is the key question as to whether one would upset the careful ruling of Judge Ware that there was no standing under the antitrust laws for a competitor alleging a price-fixing, maximum-price conspiracy. And there are no damages. There's no injury as a consequence of that. And the law under Matshusta and Atlantic Richfield is clear. In the reply brief, which we have- Assume there was bid rigging. Assume there was bid rigging, as alleged. Would that be evidence that could come in by way of evidentiary proof of motive, attempt to monopolize? There are two responses to that question, Your Honor, and both of them were addressed in the district court. One is that it's an illogical assumption of motivation. If one has a maximum-price bid rigging situation, then it is not used in order to exclude a competitor. It wouldn't be the motivation to harm the plaintiff. Well, wait a minute. I'm trying to piece together the theory and make sure we're talking about, because these labels are a little elusive when tied to some of the allegations. The theory that's advanced here is that your client entered into bribed relationships with the people who specified the flat spec or no substitute specifications. Thereby, on those bids, your client would have a virtual monopoly by virtue of it having control over a component of the HVA system. So the bribes were part of the anti-competitive scheme. And that allowed, as I'm understanding, trying to understand the allegation, that allowed your client to extract a higher price than would have been achieved on the bid if there had been a competitive bid from the plaintiff who could have come in lower. Now, when he says there's no damages, I'm not sure what the damages, presumably, is what they're trying to claim under the tying side of the equation. So if, in the course of the trial, evidence was presented on this theory, and I don't know if it was, if it was, then I'm not sure what the problem is. And if it wasn't, why wouldn't it have been relevant to that, the theory that I've hopefully articulated? The evidence of alleged bribery here, entertainment and gratuities, was extensively tried before the jury and was found to be wanting. The jury answered the special verdict at questions seven, eight, and ten to the negative, that there was no bribery. So that was fully tried. What the plaintiff here wanted to do was to use a theory in which they lacked standing, could not have been injured, not in order to create a motivation. That is a post hoc lawyer's effort to try to bootstrap an irrelevant series of facts into a case. They wanted to try to use it. It's clear from the record. They wanted to inflame the jury and to argue that somehow price fixing, which could never have injured them, and which we denied ever occurred, of course, was a motivation. It makes no economic sense. And it's a classic case of where Federal Rules of Evidence 403 comes into play. And irrelevant, prejudicial, non-probative testimony, argument from counsel and the like is excluded on an issue that's deemed irrelevant as a matter of law. So that was very well considered by the court. You said it was tried, though, before the jury? The bribery issues were completely tried before the jury, Your Honor. And the instructions on bribery, you know, Judge and the others. So what was excluded? The only thing. A freestanding claim of bid rigging and price fixing? Yes. The arguments that there was bid rigging or price fixing or using those labels, which is what counsel wanted to do. I see. Okay. That clarifies your answer. All right. Thank you. Can you address, then, the tying issue? Yes, I can. Under both Sherman Act and the Cartwright Act. Sure. And they failed for the same reason, Your Honor, and that is that regardless of whether one's applying the Sherman Act or the Cartwright Act, one has to identify the tied and tying products. There is a slight difference between Business and Code, Business Professions Code Section 16727 and the federal law with respect to the requirement to show market power in the tying product. The case law under California allows that one can create a, support a claim under state law if one shows a substantial amount of sales in the tying product market. Whether you're talking about market power in the tying product as required by federal law or a substantial amount of sales in the tied product under state law, you still have to define the tying and tied products. And what we were faced with in this case was an amorphous effort by the plaintiffs to avoid their burden of proof, to establish that there were X number of products here that were the tied products and X number of products over here that were the tying products so one could establish what those markets were and what the substantial amount of sales were. And that's why the district court, and it's quoted in our brief at pages 44 and 45, rejected the request to instruct on the Cartwright claim because under their theory, one could create a claim as broad as one's ability to put a label on a product. That's not what the law requires. The jury instruction here under tying, under tying under California law says put these particular products, list them. They couldn't do that. And they couldn't do that in a number of other places. They couldn't identify the conspirators in this case either. And I thought the Court's comments as to why it granted judgment as a matter of law with respect to conspiracy that would involve our client after the close of the plaintiff's case and the Mr. Bailey's client after the close of the plaintiff's case were instructive. And so this is a case where the plaintiff's attorney has a huge number of projects and a single conspiracy, and they're alleging 150 projects and 150 conspiracies. And the judge says, the plaintiff has alleged, they have alleged a huge number of projects and a single conspiracy, or they are alleging 150 projects and 150 conspiracies, or they are alleging there aren't conspiracies as to these hundred projects, there's only a conspiracy as to this finite group. But at this point, and this was after all of the evidence had come in and both sides had rested, the judge says, you can't tell me the answer to that question. And the lawyer for the plaintiffs, Mr. Brasso, says, quote, I can't, unquote. Couldn't identify the conspirators and what they had done in the acts of furtherance. And the Court said, quote, and it is frustrating to the Court to ask and not have a clear answer. So that's why the motion for judgment is granted. And we had the same issue with respect to the time products and very many issues in the case. It was amorphously done. There was no bribery in this case that was tried to a jury. The Court very carefully instructed the jury with respect to the elements of bribery and made it very clear, and this is at page 1134 of Volume V of the Supplemental Excerpts of Record, that there has to be some kind of quid pro quo. You have to connect the donative act, the gratuity, to a person, as Judge Noonan has indicated, who. You have to identify when. And then you have to identify that something on the part of the recipient occurred, that is, an obligation, moral, legal or otherwise, arose that otherwise wouldn't have happened. Otherwise, all gifts become bribes. That's not the law. This case actually tried that issue to 12 good citizens, and they rejected this claim after all the evidence. Thank you. All right. I'll give your co-counsel his or her two minutes. His two minutes. Thank you, Your Honor. If it may please the Court, my name is Sloan Bailey. I represent F.W. Spencer & Son, a mechanical and plumbing subcontractor. If it may please the Court, any time left over for my two minutes, I'd like to see back to you. Don't use it up. Just tell us, you've been accused of bribery, apparently. Well, there was all kinds of affirmative testimony that they were not involved in bribery or the plans or specifications in any way, Your Honor. F.W. Spencer & Son, Inc. got out of the case on a J-mall because there was virtually no testimony about them at all, and what there was on the issues of were they involved in helping with the plans and specs or bribery, those witnesses who were asked all said affirmatively no. But what about the changed testimony? Okay. So this is their, I guess, their big point now, Your Honor. I recognize that. We have three responses regarding Mr. Spencer's testimony regarding the lowest price. Please keep in mind, Your Honor, that Spencer is a customer or a potential customer of the appellant and codefendant here. Okay. So that testimony regarding whether Mr. Spencer's company took the lowest price is what Judge Ware and we contend, Your Honor, there's no obligation to take the lowest price. In other words, there's all kinds of law, Your Honor, that basically in the United States, you're entitled to select any terms, conditions or qualifications as you choose because you're entitled to act in that way. That law, Your Honor, we cite for that is Verizon case, the U.S. v. Colgate case, the Pacta telephone case in Monsanto. The second reason why it's irrelevant based on no duty to pick the lowest price is because Judge Ware asked the appellant, Your Honor, if they could present some rule or regulation of the municipality that would show that Mr. Spencer, who's a, you know, a subcontractor, is there some obligation for sub-tiered contracts with mechanical suppliers or otherwise, or is there some public bidding rules or regulations that apply to them? And they put on Mr. Norman, who's city attorney for San Francisco, who said no. And that testimony, Your Honor, appears at Volume 4 of the Supplemental Excerpts of Record at pages 696, 697. I asked him that question, and he said no. So the first reason why that testimony, Your Honor, changed or not, which we contend it wasn't, is irrelevant is because there was no duty. The second reason is because the quote was not responsive. In other words, it was to – respectfully, Your Honor, subcontractors don't consider a quote if it's not – if it doesn't meet what the plans and specs require it to. So simply saying, if a mechanical supplier provides to a sub a quote that says, we will provide an air conditioner, it doesn't match it when the specs require Model XYZ from manufacturer so-and-so that has so many BTUs and covers all these other very specific qualifications. The Norman Wright quote went into excruciating detail about precisely what was going to be provided. So from a sub's perspective, who's going to have to live with whatever gets, you know, provided to the project, he picked in some cases what's more – not just responsive, but whom he has confidence in is going to fulfill it. And that, Your Honor, what can be compared just from a common-sense standpoint are the two quotes, the one that he's being contended, a million dollars lower, and like a $4 million job, a million dollar lower quote from the appellants appears at four excerpts of record beginning at page 617. Compare that with the Norman Wright quote, which appears at four excerpts of record beginning at page 609, and you'll see that the appellant's one doesn't contain sufficient detail for a reasonable subcontractor to pick it. Naturally, in what they testified at trial is you get a little apprehensive. Okay. We'll look at the exhibit. And then finally, Your Honor, it's also irrelevant because the involvement of Spencer in the case was at best in three out of 150 projects. And so it simply doesn't reach the threshold by which, no matter what happened, it was sufficient to hold F.W. Spencer and Sonny Inc. responsible. Did Mr. Spencer change his testimony for the trial? He did not, Your Honor. I defended him both at his deposition and at trial. Counsel said that he got him to admit that on the stand. There's an out-of-context statement, Your Honor, where Mr. Spencer becomes frustrated, which is obvious from reading the entire record, Your Honor, at the questioning what is perceived to him who, an honorable, decent contractor, Your Honor, who is becoming frustrated at the fact that he's not being held responsible. It's not, Your Honor. In other words, there is a response which, taken out of context, is something like, I don't care, whatever you want to say. Do you have the record cite for that? Yes, Your Honor, I do. I wanted, if you can't find it right away, give it to us after the rebuttal by Mr. Alley. Okay. I'll do that, Your Honor. Thank you. I'll cede the rest of my time back, Your Honor. There is no rest of time. I told you at the beginning, you know, it counts up, everybody ignores it. It's our fault for the digital clock. Okay. Mr. Alley, you have two minutes. Thank you very much, Your Honor. Citation to the record is page 662. Okay. The testimony is with regard to his former statement that he took the lowest bid. It ends up, I said, well, you just, after a very heated cross-examination, which we have put on page 23 of our brief, the reply brief. Okay. You've given me the cite. Okay. That's fine. You made this up for trial. You just made that up for this trial. Answer, absolutely. Okay. Okay. So we've got that. Of course, that protecting a price-fixing agreement is a motive. It goes way back to Story Parchment, where they were fixing the price and they used That may be, but it's not a freestanding claim. No. Okay. So your complaint is that what got excluded about bribery then? Yes, that they excluded or prohibited us from showing that the motive was to protect this price-fixing agreement. How did they, the judge, exclude? The judge should have instructed the jury that if these folks fixed the price and that if this, and if they had a bid-rigging agreement, you could consider that to be the motive as to why they took the means of the bribery and the tie-in arrangements. So where did the judge tell the jury that or how would? He didn't. He wouldn't. How would and how was he supposed to instruct them? He was supposed to instruct the jury that if you find that they fixed the price on the bids, that that could be considered by you in the totality under continental law to be the motive and intent as to why they conducted these other activities to exclude competitors. Did you attempt to prove price-fixing in the course of the trial? Of course, and easily, because we actually had people who made the admission that that's, in fact, what was going on. But you're saying it was that you put in sufficient evidence to support a jury instruction that there was both bribery and price-fixing? Yes, except that the judge excluded most of the price-fixing. All right. And so we were not permitted to put in most of the price-fixing evidence. Okay. And then you proffered a jury instruction that used those terms, that if they engaged in bid-rigging or price-fixing, the jury could count on that. No, we did not, because he would not accept anything with regard to bid-rigging because he saw it differently as if it were being a separate claim. And you can see in the defendant's brief, they quoted me when I told the judge specifically that, that we're not expecting a claim on that because we're not a project building a building. We're using that as motive and intent. Also, Your Honor You said there were no damages from it, so That's right. That was in the sense that, well, I'm not exactly clear, but you are claiming damages from it being the cause of your being excluded from the bid. So there were damages traceable to bribery and price-fixing. Well, I'm not sure about the price-fixing. They were protecting their bid-rigging. Okay. All right. Now, with regard to the government bribes, as they say, that we had a free load on that, and they also said that that was the answer to the jury instructions – I mean, the jury issues – and they said 7, 8, and 9, that's not correct, because what happened, number 7, was, as we've already gone over, number 7, did the plaintiffs prove that, during the relevant time period, the defendant was engaged in interstate commerce? And they answered no, even though we had the admission. All right. And the reason they answered no is that the court said, for you to substantiate the bribery, you have to show that the bribery crossed state lines. And we also had Cartwright, where all the bribes, most of them, were in and made in California. And so the judge gave them an instruction as if it were a two-way price discrimination where one had to be on the other side of the – impossible, we weren't there, we were in California. Okay. So as soon as that – You're over time. Okay. I think we have it, the rest of it, in the briefs. Thank you, counsel. May it please the Court. Thank you very much. You're welcome. We appreciate the argument and the case that's submitted. Did he give the appropriate citation? It's one of them, Your Honor. Could I direct the Court to the three places in the record? Sure. One of them is at 3 S.E.R. beginning at page 422. The second one begins on that same supplemental excerpt record beginning at page 460 to 462. And the third one is pages 583 to 585. Thank you. Thank you. Good. The case is submitted.
judges: Noonan, Fisher, Nguyen